**Marcus J. SANDERS and Dairyland Insurance Company, Plaintiffs,**

v.

**Rebecca J. SCHEIDELER, an adult, Jason B. Scheideler, DOB 2/25/81, Joshua D. Scheideler, DOB 9/13/79, Andrea J. Scheideler, DOB 5/22/84, Dustin Scheideler, DOB 2/4/83, Daniel G. Scheideler, an adult, and NEPCO EMBA, Defendants.**

No. 92–C–0477–C.

United States District Court, W.D. Wisconsin.

March 23, 1993.

Rebecca J. Scheideler, pro se.

Daniel G. Scheideler, pro se.

Susan C. Schill, Crowns, Midthun, Metcalf & Quinn, Wisconsin Rapids, WI, for Jason B. Scheideler, Joshua D. Scheideler, Andrea J. Scheideler, Dustin Scheideler.

Lee J. Geronime, Michael, Best & Friedrich, Milwaukee, WI, for NEPCO EMBA.

## OPINION and ORDER

CRABB, Chief Judge.

This is a civil action for a declaration of rights to the proceeds of an insurance policy. The parties asserting rights are defendants Joshua, Andrea, Dustin and Daniel Scheideler, all minors, and defendant NEPCO EMBA, a self-insured employee benefit plan established under 29 U.S.C. § 1102. The dispute concerns defendant NEPCO EMBA's entitlement to reimbursement for medical payments made on behalf of the Scheidelers.

Before the court are cross-motions for summary judgment by the Scheideler children and NEPCO EMBA. NEPCO EMBA contends that it is subrogated to the rights of the Scheideler children to the full extent of the insurance proceeds. The Scheideler children maintain that NEPCO EMBA's subrogation rights are limited to third party payments that duplicate medical benefits paid by the fund and that their interest in the proceeds concerns losses other than medical costs. Because the Plan fails to grant priority to either of the defendants, I will adopt as federal common law the "make-whole" doctrine as a default priority rule. The parties' motions for summary judgment will be denied and a hearing will be set to determine the amount of the Scheideler children's damages.

To succeed on a motion for summary judgment, the moving party must show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1412 (7th Cir. 1989). When the moving party succeeds in showing the absence of a genuine issue as to any material fact, the opposing party must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986); *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). The opposing party cannot rest on the pleadings alone, but must designate

specific facts in affidavits, depositions, answers to interrogatories or admissions that establish that there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Also, if a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the opposing party is proper. *Id.* at 322, 106 S.Ct. at 2552.

The relevant facts derive from the parties' proposed findings of fact and from copies of NEPCO EMBA's Articles of Association and other documents related to its plan. For the purpose only of deciding the parties' cross-motions for summary judgment, I find the following facts to be undisputed.

## FACTS

Plaintiff Marcus J. Sanders is an adult resident of New Mexico. He was insured against liability for automobile accidents for up to $50,000 by plaintiff Dairyland Insurance Company, a Wisconsin corporation with its main office in Stevens Point, Wisconsin. Defendants Rebecca J. Scheideler and Daniel G. Scheideler reside in Nekoosa, Wisconsin. Their children are defendants Jason B. Scheideler, Joshua D. Scheideler, Andrea J. Scheideler and Dustin G. Scheideler, all of whom are minors.

Defendant NEPCO EMBA is a self-funded "employee welfare benefit plan" within the meaning of § 3(1) of ERISA, 29 U.S.C. § 1002(1). The plan is a voluntary health care plan available to eligible employees of the Georgia–Pacific Corporation (formerly Nekoosa Papers, Inc.).

NEPCO EMBA's Articles of Association authorize a board of directors to govern the plan's affairs (Art. III, § 1). The board is granted the power to terminate the plan (Art. XII, § 1), to amend by majority vote the terms, conditions and limitations governing benefits (Art. II, § 2), and to make final decisions with respect to proposed settlements of claims by the executive committee (Art. IX, § 8). The articles authorize an executive committee to "pass upon all claims by a member against the association" (Art. III, § 12) and "to authorize payment of benefits; accept or reject all applications for members ... and perform such other duties as may be required by the Board of Directors." (Art. III, § 10).

At all times relevant to this action, defendant Daniel Scheideler was an eligible employee and a participant in the NEPCO EMBA. His wife and children were eligible for benefits under the NEPCO EMBA group medical plan as his dependents.

On March 3, 1992, an automobile driven by defendant Rebecca J. Scheideler collided with a vehicle driven by plaintiff Sanders. Defendants Rebecca, Jason, Joshua, Andrea and Dustin Scheideler sustained injuries requiring medical treatment. The negligence of plaintiff Sanders was a substantial factor and proximate cause of the accident and injuries sustained by the Scheideler family.

As of July 1, 1992, NEPCO EMBA has paid $156,680.70 in benefits to Daniel Scheideler for treatment of the injuries sustained by his wife and children in the March 3 accident. The payments have been disbursed as follows:

| | |
|---|---|
| Rebecca J. Scheideler | $ 28,664.46 |
| Jason B. Scheideler | $ 21,500.17 |
| Joshua D. Scheideler | $100,657.13 |
| Dustin Scheideler | $ 1,839.46 |
| Andrea Scheideler | $ 4,007.55 |

The NEPCO EMBA Articles of Association contain a subrogation clause that provides as follows:

Section 2. Third Party Liability

If the employee is reimbursed for medical expenses incurred as the result of an injury by either the person causing such injury or that person's insurance, such payments that duplicate benefits paid by NEMBA

will be refunded to NEMBA by the employee.

The Articles of Association also contain the following "Coordination of Benefits" provision:

This plan has been designed to help the employee meet the cost of disease or injury. Since it is not intended that he receive greater benefits than the actual medical expenses incurred, any coverage he has under other "plans" will be taken into account in determining the amount of benefit payable under this plan; that is, the benefits of this plan will be coordinated with the benefits of the other plans.

Specifically, this plan will pay either its regular benefits in full, or a reduced amount which, when added to the benefits available under the other plan or plans, will equal 100% of "allowable expenses."

The NEPCO EMBA Group Medical Benefits Plan Summary Plan Description contains a third party liability provision that provides:

If a claim for benefits under this Plan arises out of an injury or illness caused by negligence or wrongful intentional conduct of a third party, the Plan shall have a priority right to recover all benefits paid from the third party and the third party's insurer. As a condition to receiving benefits relating to injury or illness, the member shall execute an agreement which assigns to the Plan the right to recover all benefits from the third party or the third party's insurer before the member may recover damages.

\* \* \* \* \* \*

This briefly describes the NEMBA plan. The complete text of the plan is contained in the Articles of Association. In the event of any conflict between this summary and the Articles, the Articles shall prevail.

On April 13, 1991, defendants Daniel and Rebecca Scheideler executed assignment agreements pursuant to this provision on behalf of themselves and their children assigning their rights to any recovery from third parties.

Plaintiff Dairyland Insurance Company stands willing to pay the full amount of the policy limits on the policy issued to plaintiff Sanders ($50,000) as soon as it is determined which party or parties are entitled to the proceeds.

## OPINION

Defendant NEPCO EMBA contends that its subrogation rights give it a priority interest in recovering the full amount of the insurance proceeds. The Scheideler children maintain that since the proceeds have never been identified as reimbursement for medical expenses, as required by the plan, NEPCO EMBA has no rights to the proceeds.

### A. Standard of Judicial Review

■ The first issue is the standard of review to be applied. NEPCO EMBA contends that under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), a deferential standard of review is appropriate because plan fiduciaries have broad discretion to interpret terms of the plan. In *Firestone*, the Supreme Court held that: "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. at 956. Although this case does not involve a denial of benefits, the Court's reliance on general principles of trust law in establishing the standard of review of a trustees' plan interpretation supports the applicability of *Firestone* to this case. *Id.* at 112, 109 S.Ct. at .955; *see Baxter By and Through Baxter v. Lynn*, 886 F.2d 182, 187 (8th Cir.1989) (applying *Firestone* to case involving interpretation of subrogation clause); *Germany v. Operating Engineers Trust Fund*, 789 F.Supp. 1165, 1171 (D.D.C. 1992); *contra Dugan v. Nickla*, 763 F.Supp. 981, 984 n. 6 (N.D.Ill.1991) (*Firestone* standard of review is inapplicable to actions other than those appealing the denial of benefits).

■ After *Firestone*, a deferential standard of review is appropriate only when a fiduciary exercises discretionary powers. Whether powers exercised by a fiduciary are discretionary is determined by the language of the plan:

A trustee may be given power to construe disputed or doubtful terms, and in such

circumstances the trustee's interpretation will not be disturbed if reasonable. Id., § 559, at 169–171. Whether "the exercise of a power is permissive or mandatory depends upon the terms of the trust." 3 W. Fratcher, Scott on Trusts § 187, p. 14 (4th ed. 1988).

Firestone, 489 U.S. at 113, 109 S.Ct. at 955. Firestone does not say how specific ERISA plan language must be to grant discretionary authority. The Court of Appeals for the Seventh Circuit has held that a deferential standard of review applies when a Plan empowers the trustee "to construe and interpret the Plan." Fuller v. CBT Corp., 905 F.2d 1055, 1058 (7th Cir.1990); Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund, 900 F.2d 1138, 1141 (7th Cir.1990) (plan gives trustees power to construe its provisions and makes their construction binding); see also Jordan v. Cameron Iron Works, Inc., 900 F.2d 53 (5th Cir.1990); Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 119 n. 5 (3d Cir.1990). However, where the plan provides only "authority to control and manage the operation and administration of the Plan," a de novo standard is appropriate. Michael Reese Hosp. & Medical Center v. Solo Cup Emp. H. Ben. Plan, 899 F.2d 639 (7th Cir.1990).

The court of appeals has yet to address the more difficult question whether and under what circumstances interpretive discretion can be inferred from other powers granted by the plan. This question arises most frequently when the Plan grants the fiduciaries "final" decisionmaking authority. Some courts view this language as indicative of broad authority while others understand it as designating simply which fiduciary has the final say. In Baxter, 886 F.2d 182, the Court of Appeals for the Eighth Circuit held that a plan providing trustees with "final authority to determine all matters of eligibility" merely described the trustee's mandatory role, and did "not necessarily confer discretionary authority to render decisions with regard to ambiguous provisions of the plan." Accord

Martin v. Masco Industries Employees' Benefit Plan, 747 F.Supp. 1150 (W.D.Pa. 1990) (refusing to infer interpretive discretion from plan that provides benefit committee with final authority to determine eligibility); Adams v. Blue Cross/Blue Shield, Inc., 757 F.Supp. 661, 667 (D.Md.1991) (although grant of power to deny benefits plausibly confers discretion, absent clear and unequivocal language no such discretion is inferred); contra Boyd v. Trustees of United Mine Wkrs. Health & Ret. F., 873 F.2d 57 (4th Cir.1989) (discretion inferred from power to make "full and final determination as to all issues concerning eligibility for benefits" and to "promulgate rules and regulations to implement" the plan); see also Gust v. Coleman Co., Inc., 740 F.Supp. 1544, 1550 (D.Kan. 1990) (plan that confers powers necessary to carry out provisions of the plan, including power to adopt rules and regulations, implicitly confers power to interpret eligibility terms of the plan), aff'd, 936 F.2d 583 (10th Cir.1991).

■■■■■ NEPCO's plan does not specifically grant fiduciaries discretion to construe ambiguous provisions of the plan. Nor does such discretion flow from the need to interpret terms in order to give effect to the plan. See Bruch, 489 U.S. at 112, 109 S.Ct. at 955 (interpretation of the plan is not an inherently discretionary function; trustee may seek court interpretation of ambiguous terms). Nonetheless, defendant NEPCO EMBA argues, interpretive discretion is implicit in the broad and expansive authority the plan invests in the executive committee to "pass upon all claims by a member" and in the board of directors to make final decisions on disputed settlements.[1] Article IX, § 8 provides specifically:

> Any member feeling aggrieved by any settlement proposed may, within ten days from action by the Executive Committee on his claim, file with the Secretary or the Administrator a request for reference to

---

1. In an attempt to suggest the sweeping nature of the fiduciaries' discretion in this case, NEPCO EMBA refers to other powers granted by the plan, such as the power to terminate the plan or amend its terms or the authority to reject or accept all applications for membership. Such powers do not relate to the question whether the

settlor of this 'trust' intended for the fiduciaries to have interpretive power with respect to ambiguous terms within the plan. See, e.g., Wallace v. Firestone Tire & Rubber Co., 882 F.2d 1327, 1329 (8th Cir.1989) (right to amend policy distinct from right to have discretionary authority to determine eligibility under the policy).

the Board of Directors for final decision, and decision thereon shall be made by the Board of Directors at their next regular meeting thereto. The decision of the Board of Directors shall be final.

This language is plainly inadequate to grant the trustees discretionary power to construe the plan's subrogation provision. The plan's grant of final authority in the board is limited to settlements by its own terms, and in any event is not comparable in scope to the plan in *Boyd*, 873 F.2d 57, which extended final authority to "all issues concerning eligibility for benefits" and further provided the power to adopt rules and regulations. By comparison, the "finality" provision in the NEPCO EMBA plan appears merely to identify the board as the entity responsible for stating the plan's ultimate position in disputed settlements. Therefore, I conclude that a de novo standard of review is appropriate.

### B. *The Summary Plan Description*

NEPCO EMBA contends that its subrogation rights are defined by the Summary Plan Description, which provides that "the plan shall have a priority right to recover all benefits paid from the third party and the third party's insurer." The Scheideler children assert correctly that this provision is in conflict with the Articles of Association, which limit subrogation rights to recovery of third party payments for "medical expenses" that "duplicate benefits paid by NEMBA." According to the conflicts clause of the Summary Plan Description, where a conflict exists between the Articles of Association and the Summary Plan Description, the former controls.

NEPCO EMBA argues that in many cases courts have set aside the conflicts clause and enforced the terms of the Summary Plan Description. No court has ever done so in favor of a plan. The purpose of a summary plan description is to distill lengthy and complex plan provisions into a concise format to ensure that beneficiaries receive notice of their rights. *See* 29 U.S.C. § 1024(b)(1)(B). Courts that have set aside the conflicts clause have done so only when a beneficiary has relied on the summary plan description. *See, e.g., Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.1988); *McKnight v. Southern Life &*

*Health Ins., Co.*, 758 F.2d 1566, 1570 (11th Cir.1985). No such reliance is at issue here. NEPCO EMBA represented to plan beneficiaries that the plan and not the Summary Plan Description controls. It cannot now repudiate this representation and rely on a provision in the summary plan that is more favorable to it. *See Glocker v. W.R. Grace & Co.*, 974 F.2d 540, 542 (4th Cir.1992). Thus, whether NEPCO EMBA has a subrogation right to the settlement funds is to be determined by the subrogation clause in the plan.

### C. *Determining Priority to the Proceeds*

Under a de novo standard of review, "courts construe terms in trust agreements without deferring to either party's interpretation." *Firestone*, 489 U.S. at 112, 109 S.Ct. at 955. "The first task of the court is to determine, as a matter of law, whether the terms at issue are ambiguous, and if they are not, to give effect to their meaning." *Martin*, 747 F.Supp. at 1153 (citing *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101–02 (3d Cir.1986).

The subrogation clause of the NEPCO EMBA Articles of Association provides as follows:

> If the employee is reimbursed for *medical expenses* incurred as the result of an injury by either the person causing such injury or that persons' insurance, *such payments that duplicate benefits paid by NEMBA* will be refunded to NEMBA by the employee.

(Emphasis added). The terms of this clause limit the subrogation rights of the fund to the recovery of payments by third parties of medical expenses that duplicate benefits paid by NEPCO EMBA.

The insurance proceeds at issue here were offered in settlement of the Scheideler family's claims against Sanders for medical expenses as well as other damages. In Wisconsin, two causes of action arise upon injury to a child: (1) the child's action for personal injury to recover damages for pain and suffering, disfigurement, etc.; and (2) the parents' action for invasion of the parents' interests, for which parties can recover for loss of society and companionship, medical expenses and other consequential damages. *Korth v.*

*American Family Ins. Co.,* 115 Wis.2d 326, 340 N.W.2d 494 (1983); *Shockley v. Prier,* 66 Wis.2d 394, 225 N.W.2d 495 (1975).

Defendants Rebecca and Daniel Scheideler concede that the fund is subrogated to their rights against the insured. As the parents of the injured children, the adult Scheidelers had claims to recover medical expenses, and Rebecca Scheideler had a separate claim for personal injuries she suffered. Because the adult Scheidelers do not contest the plan's rights, and in the absence of any evidence of claims by them for other damages, I will presume their interest in the insurance proceeds is limited to reimbursement for medical expenses that duplicate payments made by the fund. The plan's subrogation provision entitles it to the insurance proceeds to the extent of the parents' interest. However, the insurance proceeds were tendered in settlement of the claims of the minor Scheideler children as well. Those claims are for damages other than medical expenses.[2] To the extent the insurance proceeds were intended to reimburse the Scheideler children for their damages, the proceeds do not duplicate any benefits paid by NEPCO EMBA.

The problem is that it is impossible to determine how the insurance proceeds were intended to be allocated. The insurance proceeds are not designated as reimbursement of the Scheidelers for any particular expense or damages. The Scheidelers' medical costs greatly exceed the $50,000 coverage. It is probable that the children's damages for pain and suffering and disfigurement also exceed the $50,000 coverage limits, although the record is silent on this point.

■ The subrogation clause does not address the priority of the plan's subrogation rights in the event of a competing claim by a member or his or her dependents to the undesignated proceeds of a limited insurance settlement. The majority common law rule precludes an insurer from exercising a right of reimbursement until the insured's entire loss has been paid. *See, e.g., Rimes v. State Farm Mut. Auto. Ins. Co.,* 106 Wis.2d 263, 316 N.W.2d 348, 354 (1982). NEPCO EMBA contends that because ERISA preempts the

application of the *Rimes* make-whole doctrine to self-funded plans, *see, e.g., FMC Corp. v. Holliday,* 498 U.S. 52, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Cutting v. Jerome Foods, Inc.,* 820 F.Supp. 1146, 1152 (W.D.Wis.1991), NEPCO EMBA has a priority right to the proceeds. However, ERISA itself does not establish the terms upon which benefits are paid or reimbursed. "Rather than regulating the substance of benefits plans, ERISA regulates the administration, disclosure and reporting of benefit plans to ensure that employees receive the benefits promised to them in writing." *Cutting,* 820 F.Supp. at 1152. Moreover, NEPCO EMBA can point to no federal common law that establishes priority in the plan in the absence of specific provisions in the plan itself.

NEPCO EMBA maintains that the plan's "Coordination of Benefits" provision evinces a policy that benefits will be disbursed only upon exhaustion of all other resources. In light of this policy, they contend, the subrogation clause should be understood to establish a priority right to all third party payments. This argument is not persuasive. NEPCO EMBA concedes that the "Coordination of Benefits" provision is intended strictly to prevent a participant who is a beneficiary of more than one health care plan from recovering more health care benefits than the actual medical expenses incurred. If anything, this provision reinforces the plain language of the subrogation provision limiting the plan's subrogation rights to third party payments for medical costs that duplicate disbursements by the plan.

■ The absence of a priority clause in the subrogation provision precludes a ready determination of the parties' rights to the proceeds. One means of resolving this case would be to determine which party should have borne the burden of establishing the allocation of the amount recovered by the insured between the covered and non-cov-

**2.** The release extended to plaintiffs by defendant minor Scheideler children, through their guardian ad litem, Susan Schill, states that "the injuries and damages sustained by Jason, Joshua, Andrea and Dustin Scheideler are permanent and progressive, and that recovery therefrom is uncertain and indefinite."

ered items. Whereas some courts place the burden on the subrogee, in this case NEPCO EMBA, as the party asserting an affirmative claim to the proceeds, *see, e.g., Ortiz v. Great Southern Fire & Cas. Ins. Co.*, 597 S.W.2d 342, 344 (Tex.1980), other courts place the burden on the party that is in the better position to control the litigation or to present evidence regarding a judgment or settlement, *see, e.g., Travelers Indem. Co. v. Ingebretsen*, 38 Cal.App.3d 858, 113 Cal.Rptr 679, 686 n. 8 (1974). *See generally,* Allan D. Windt, Insurance Claims and Disputes § 10.06 at 538 n. 54 (2d ed. 1992). The latter rule appears the sounder one. However, in this case, the record does not permit a determination of which party was in a better position to allocate the burden. The Scheidelers cannot be presumed to be in the better position merely because of their status as subrogors. In all probability, their reliance on the plan's priority as defined in the Summary Plan Description kept them from making efforts to effect designation of the proceeds. On the other hand, although the plan was entitled to notice of any settlement in order to protect its subrogation rights, the record does not reflect that it had such notice or opportunity to participate in any settlement negotiations. Indeed, there is no evidence that settlement negotiations took place at all. In this situation, it would be inappropriate to place the burden of proving allocation of the proceeds on either side.

Another means of resolving this unusual situation is to create a federal common law default priority rule. "[T]he legislative history of ERISA indicates that Congress expected 'that a federal common law of rights and obligations under ERISA regulated plans would develop.'" *Wahl v. Northern Telecom Inc.*, 726 F.Supp. 235, 241 (E.D.Wis.1989) (citing 120 Cong.Rec. 29,942). Some equitable considerations militate in favor either of creating priority in the plan. For instance, reimbursements to self-funded employee benefit plans inure to the benefit of all plan beneficiaries by ensuring the viability of a plan. Beneficiaries should not suffer in the event that the plan fiduciaries fail to adopt provisions that protect the interests of the beneficiaries. On the other hand, beneficiaries such as the Scheidelers are entitled to rely on the mutual rights of the parties as

defined by the plan. The governing articles of association limit the plan's subrogation rights and withhold discretion from the fiduciaries to alter this provision except by majority vote by the board of directors. The board has refrained from exercising its power to broaden the plan's subrogation rights by amending the plan. In these circumstances, it would be inappropriate to expand the plan's rights via equitable subrogation. *See, e.g., Spirek v. State Farm Mut. Auto Ins. Co.*, 65 Ill.App.3d 440, 21 Ill.Dec. 817, 823–24, 382 N.E.2d 111, 117–18 (1978) (insurer not entitled to equitable subrogation that contravenes the limitations on subrogation established by the policy). Moreover, the primary purpose of equitable subrogation is to prevent a double recovery by the subrogor. It would distort this doctrine to adopt a priority rule that presumes that some or all of the unidentified insurance proceeds duplicate disbursements made by the plan and disregards whether beneficiaries are compensated for their injuries. For these reasons, I will refrain from adopting a common law priority rule that favors the plan.

An alternative default priority rule exists in Wisconsin's common law "make-whole" doctrine, which provides that an insurer cannot assert a subrogation right until the insured is fully compensated for his or her injuries. *See, e.g., Rimes*, 106 Wis.2d at 271, 316 N.W.2d at 354; *Garrity v. Rural Mut. Ins. Co.*, 77 Wis.2d 537, 253 N.W.2d 512 (1977). The doctrine is not unique to this state; in fact, it is the majority rule. *See* Windt, *supra* at 533; Robert E. Keeton and Alan I. Widiss, Insurance Law § 3.10 at 236 (1988).

▮▮▮▮ It is well established that state subrogation doctrines are preempted under ERISA. *Holliday*, 498 U.S. at 56–58, 111 S.Ct. at 407. In *Cutting*, 820 F.Supp. at 1152, a plan refused to provide reimbursements to a beneficiary until she signed a subrogation agreement that provided the plan with a priority right to all claims by her against a third party. The beneficiary requested that this court adopt the "make-whole" doctrine as federal common law and set aside the subrogation provision. I de-

clined to do so, reasoning that it would "be tantamount to dictating the substance of defendant's Plan, and would have the effect of allowing state law to govern in an area in which state law is preempted." An additional factor that militated against doing so was the rationale articulated in *Holliday,* that to do so would interfere with the "calculation of uniform benefits nationwide." *Cutting,* 820 F.Supp. at 1152 (citing *Holliday,* 498 U.S. at 60, 111 S.Ct. at 409). In this case, however, application of the make-whole doctrine would not supplant or dictate the terms of the plan. The doctrine would serve strictly as a default rule to be applied only when a plan fails to designate priority rules or provide its fiduciaries the discretion necessary to construe the plan accordingly. In the alternative, the plan and its beneficiaries could avoid the application of this doctrine by agreeing to designate the insurance proceeds. Adoption of the make-whole doctrine as a default priority rule appears consistent with the congressional mandate to fashion federal common law to facilitate the ERISA scheme.

 Assuming the propriety under the ERISA framework of adopting the make-whole doctrine as federal common law, there remains for consideration the practicality of this solution. According to *Rimes,* 106 Wis.2d 263, 316 N.W.2d 348, the mere fact that the Scheideler children have executed a release in exchange for Dairyland's tender of the $50,000 proceeds into court does not mean that they have been fully compensated. *Rimes,* 106 Wis.2d 263, 316 N.W.2d 348, 354. However, to determine whether a subrogor has been made whole by a settlement, a trial is necessary to determine the extent of his or her damages. A jury trial is not required. *Id.* 316 N.W.2d at 356. I conclude that it would not be too burdensome to resolve disputes such as this one by requiring a court trial at which evidence can be submitted as to the extent of the subrogor's damages.

In sum, I conclude that this dispute is to be resolved according to the federal common law make-whole doctrine. Since the record does not reflect the extent of the Scheideler children's damages, I will deny the parties' motions for summary judgment and set a trial date at which the damages issue can be resolved.

### D. *The Assignment Agreements*

 The assignment agreements executed on behalf of the minor Scheideler children by their father have no effect on the outcome of this case. Setting aside the question whether ERISA preempts a contract action to enforce an agreement that contravenes the terms of the plan, I conclude that the agreements are not enforceable. In return for the assignment, the plan promised only to fulfill a pre-existing duty to pay the Scheidelers' medical expenses. The absence of any new consideration renders the agreement unenforceable. *See* Windt, § 10.06 at 538 n. 54.

### E. *Attorney's Fees*

 The Scheideler children request that NEPCO EMBA pay their reasonable attorney's fees in maintaining this action, pursuant to 29 U.S.C. § 1132(g)(1). Section § 1132(g)(1) states that "[i]n any action under the subchapter by a participant, beneficiary or fiduciary, the Court in its discretion may allow reasonable fees and costs of action to either party." A party seeking fees must first show that it is the prevailing party in the action. *Egert v. Connecticut Gen. Life Ins. Co.,* 768 F.Supp. 216 (N.D.Ill.1991).

I will address the Scheideler children's request for attorney's fees only after a final determination of the parties' rights to the proceeds, and only after the matter of attorney's fees has been briefed by both sides. A briefing schedule will be established after the court trial.

### ORDER

IT IS ORDERED that the cross-motions for summary judgment of defendant NEPCO EMBA and defendant Scheideler children are DENIED.

A hearing will be set for May 21, 1993, to determine the amount of damages incurred by the defendant minor Scheideler children.